**George DOWDELL, as Administrator of the Estate of Joseph Dowdell, Plaintiff,**

v.

**Herman CHAPMAN, et al., Defendants.**

**Civ. No. 95–D–1073–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

May 6, 1996.

counsel, the relevant case law and the record as a whole, the court finds that the defendants' motions are due to be granted.

Donald R. Harrison, Harrison & Edmondson, LLC, Dadeville, AL, for plaintiff.

Daryl L. Masters, Kelly Gallops Davidson, Webb & Eley, P.C., Montgomery, AL, for defendants Herman Chapman, Lee County, Alabama, Lee County Sheriff's Office and Steve Thompson.

Charles Winston Sheehan, Jr., Ball, Ball, Matthews & Novak, P.A., Montgomery, AL, for defendant Town of Notasulga, Alabama.

Charles Winston Sheehan, Jr., Allison L. Alford, Ball, Ball, Matthews & Novak, P.A., Montgomery, AL, for defendant Durward Ronald Ward.

## MEMORANDUM OPINION

DE MENT, District Judge.

Before the court is defendant Town of Notasulga's motion for summary judgment filed December 12, 1995; defendant Lee County, Alabama's motion for summary judgment filed December 12, 1995; defendants Herman Chapman and Steve Thompson's motion for summary judgment filed December 12, 1995; defendant Ronald Ward's motion for summary judgment filed February 26, 1996; and defendants Chapman and Thompson's motion to strike filed February 21, 1996. The plaintiff, George Dowdell, responded in opposition on December 28, 1995, March 28, 1996, and March 29, 1996. Because the motions involve similar issues and arise from the same set of facts, the court will address them simultaneously.[1] In ruling on said motions, the court has considered the parties' respective briefs, as well as the replies and responses thereto. After careful consideration of the arguments of

## JURISDICTION AND VENUE

The plaintiff alleges that the defendants abridged certain rights guaranteed by the United States Constitution; therefore, jurisdiction is proper under 28 U.S.C. § 1331.[2] Personal jurisdiction and venue are uncontested.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and

1. The motions for summary judgment now before the court also incorporate arguments from the motions to dismiss previously filed in this case. Because this memorandum opinion is dispositive of the federal issues in favor of the defendants, the court need not rule on the motions to dismiss, other than the motion filed by defendant Lee County Sheriff's Department, and will deny them as moot in a separate order. However, the court notes that most, if not all, of the issues in the motions to dismiss are addressed herein.

2. Section 1331 provides, "[t]he federal district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States." 28 U.S.C. § 1331.

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,' " that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

### FINDINGS OF FACT

On August 16, 1993, Mae Ola Dowdell ("Ms. Dowdell") sought to file a petition with the Honorable Hal Smith, Probate Judge of Lee County, regarding the mental commit-ment of her husband, Joseph Dowdell ("Mr. Dowdell"). Defs Chapman & Thompson's Ex. 16. Judge Smith appointed an attorney, Margaret Mayfield, Esquire, to represent Ms. Dowdell in this matter. *Id.* Ms. Dowdell met with Ms. Mayfield, who completed a petition for involuntary commitment of Mr. Dowdell on this same date, August 16, 1993. *Id.* & Ex. 1.

As reasons for such involuntary commitment, Ms. Dowdell stated that she believed her husband was mentally ill because (1) he was not taking his prescribed medication properly; (2) he appeared to be paranoid; (3) he believed she was trying to poison him; (4) he had been committed in the past; and (5) only two days prior to Ms. Dowdell's filing for the petition, Mr. Dowdell had pulled a firearm on Ms. Dowdell and threatened to kill her. *Id.* Ex. 1 & 16; Pl.'s Ex. 1 (attach. to Pl.'s Resp. filed Mar. 29, 1996). Based on the petition for involuntary commitment, the facts relayed by Ms. Dowdell and the advice of legal counsel, Judge Smith determined that it was not only appropriate, but imperative, that Mr. Dowdell be placed in a hospital for psychiatric evaluation and treatment. Defs Chapman & Thompson's Ex. 16. Therefore, Judge Smith entered an order directing the Lee County Sheriff's Department to take Mr. Dowdell to the psychiatric ward at East Alabama Medical Center. *Id.* & Ex. 2. The order also stated that the Sheriff's Department should bring Mr. Dowdell before Judge Smith on August 19, 1993 at 11:15 p.m. *Id.* Ex. 2.

On August 16, 1993, Deputy Steve Thompson picked up three separate involuntary commitment orders at the Lee County Sheriff's Department each of which were to be served that day. *Id.* Ex. 3. Pursuant to the standing operating procedure of the Lee County Sheriff's Department, two officers are required to carry out involuntary mental commitment "pick-up" orders due to the unpredictability of mentally ill persons. *Id.* & Ex. 4.

Because no Sheriff's Department officers were available, Deputy Thompson contacted officers of other agencies from within the jurisdiction where the commitment papers were to be served. Aff. of Thompson. Dep-

uty Thompson first served an involuntary commitment order with an Auburn Police officer on an individual in the Auburn, Alabama, area. *Id.* Deputy Thompson's second involuntary commitment order was to be executed on Mr. Dowdell in the Notasulga, Alabama, area. *Id.*

Deputy Thompson contacted the Notasulga Police Department between 4:30 p.m. and 5:15 p.m. regarding its assistance in serving the involuntary commitment order on Mr. Dowdell. Subsequently, Deputy Thompson met Notasulga Police Officer Ronnie Ward at Bell's Grocery on Highway 188. Aff. of Thompson; Aff. of Ward. Officer Ward and Deputy Thompson then traveled to Mr. Dowdell's residence in separate cars. Aff. of Thompson.

Upon arriving at Mr. Dowdell's residence, Deputy Thompson and Officer Ward observed a man sitting on the steps under the carport. Aff. of Thompson; Aff. of Ward; Defs Chapman & Thompson's Ex. 5. Deputy Thompson pulled into the driveway and parked diagonally in the yard as Officer Ward pulled in behind Deputy Thompson and parked behind a green Ford. *Id.;* Defs Chapman & Thompson's Ex. 6. Deputy Thompson and Officer Ward approached the man seated on the steps and Deputy Thompson stated that they were looking for Mr. Dowdell. *Id.* The individual then stated that he was Joseph Dowdell. Aff. of Ward. Deputy Thompson advised Mr. Dowdell that he had an order signed by Judge Smith to transport him to East Alabama Medical Center. *Id.;* Aff. of Thompson. Mr. Dowdell stood up and said "get off my property." *Id.* Deputy Thompson then attempted to approach Mr. Dowdell, and Mr. Dowdell told him to get out of his yard. *Id.*

Mr. Dowdell then ran into the house and through the kitchen as both Deputy Thompson and Officer Ward followed. Aff. of Thompson; Aff. of Ward. Mr. Dowdell then ran into a dark bedroom and Deputy Thompson heard him picking up something. *Id.* Because Deputy Thompson feared that Mr. Dowdell was obtaining a firearm, Deputy Thompson ran from the house as did Officer Ward. *Id.* Officer Ward exited through the side carport door, while Deputy Thompson

ran through the living room and out the front door. *Id.* Both Officer Ward and Deputy Thompson ran to the rear of the green Ford in the driveway and drew their weapons. *Id.;* Aff. of Ward.

Mr. Dowdell came to the front door and opened it slightly, while staying inside the house, and again yelled several times "get off my property." Aff. of Thompson. Mr. Dowdell then fired a shot from his pistol through the front screen door at the Ford, behind which the officers were hiding. *Id.;* Aff. of Ward. The bullet hit the car door and ricocheted inside the automobile landing in the area where Deputy Thompson was kneeling down. *Id.;* Defs Chapman & Thompson's Ex. 8. As a result, Deputy Thompson fired one shot towards the front door in an attempt to keep Mr. Dowdell from shooting at him and Officer Ward again. *Id.;* Aff. of Ward. Deputy Thompson later learned that his bullet hit a door or window frame of the house and did not injure Mr. Dowdell. *Id.;* Defs Chapman & Thompson's Ex. 9.

After the firing of Deputy Thompson's firearm, Mr. Dowdell went back into the house. Aff. of Thompson. Officer Ward ran back to his car. Aff. of Ward. Fearing that he might try to exit the house through some other door or window, Deputy Thompson ran to the back corner of the house on the side of the carport so that he could view both the back of the house and the side entrance under the covered carport simultaneously. *Id.;* Defs Chapman & Thompson's Ex. 10. During this time, Deputy Thompson continued to hear Mr. Dowdell talking loudly to himself in the kitchen area. *Id.* Because Deputy Thompson feared that Mr. Dowdell could shoot him from the kitchen window, Deputy Thompson took cover behind a fifty-five gallon drum, which was used to burn trash. *Id.;* Aff. of Ward. Deputy Thompson observed Mr. Dowdell in the kitchen area holding what appeared to be a rifle or a shotgun in addition to his small pistol. *Id.* However, Deputy Thompson could not tell if the weapon was a rifle or a shotgun. *Id.* Deputy Thompson yelled for Mr. Dowdell to drop the firearms; however, Mr. Dowdell yelled that he wasn't going to drop anything.

*Id.* Deputy Thompson then yelled "drop the guns or I'll blow your ass away."

Mr. Dowdell then put the pistol down and shot out of the side entrance door towards the drum with the rifle or shotgun. *Id.;* Defs Chapman & Thompson's Ex. 11. During this time, Officer Ward looked toward the carport door and saw a shotgun barrel sticking out, pointed toward Deputy Thompson. Aff. of Ward. Deputy Thompson heard pellets hit the metal drum, and he felt debris or pellets going through his hair. *Id.* The drum was almost in line with the side entrance door. Aff. of Thompson. Deputy Thompson then raised up and saw Mr. Dowdell reloading his firearm and Deputy Thompson fired his weapon. *Id.;* Aff. of Ward. The first shot hit the washing machine located under the covered carport outside the side door. *Id.;* Defs Chapman & Thompson's Ex. 12. Deputy Thompson then fired a second shot, which he later learned hit Mr. Dowdell. *Id.* Not being aware that he had hit Mr. Dowdell, Deputy Thompson thought Mr. Dowdell was bending over to take cover. *Id.* As a result, Deputy Thompson yelled to Officer Ward that Mr. Dowdell was getting on the floor. *Id.* It became quiet in the house and Deputy Thompson yelled several times for Mr. Dowdell to come out with his hands up, but there was no answer. *Id.*

During this time, Officer Ward had radioed from his car a code "double zero," which means that there is an emergency and that an officer needs assistance. Aff. of Thompson; Aff of Ward. As a result, backup officers quickly arrived at Mr. Dowdell's residence. *Id.* Deputy Thompson and Officer Ward waited until the arrival of other officers before proceeding inside the house. *Id.* During the entire incident, Officer Ward never shot his weapon. Aff. of Ward; Aff. of Corporal Wright.

Officer Gastaldo and Officer Bass of the City of Auburn Police Department went into the home with the protection of tactical shields. Aff. of Thompson. These officers then found Mr. Dowdell lying on his back in the kitchen area and showing no signs of life. *Id.* A shotgun was lying under Mr. Dowdell's legs and a .45 Caliber cartridge was found in his hand. *Id.;* Defs Chapman & Thompson's Exs. 13 & 14. Also located near Mr. Dowdell in the kitchen area was a semiautomatic pistol, which Mr. Dowdell apparently used to shoot at Officer Ward and Deputy Thompson. *Id.;* Defs Chapman & Thompson's Ex. 15. Deputy Thompson did not discover until after the investigation that Mr. Dowdell was loading the weapons one round at a time. *Id.*

## DISCUSSION

### I. Motion to Strike

■ Before proceeding to the issues presented in the summary judgment motion, the court will first address Sheriff Chapman and Deputy Thompson's motion to strike contained in their reply to the plaintiff's response, filed February 21, 1996. The defendants seek to strike the plaintiff's submission of a newspaper article from the *Dothan Eagle,* attached as Exhibit A to the plaintiff's response filed January 26, 1996. The motion to strike is not contested by the defendant.

The court finds that the unsworn article impermissibly puts before the court matters not contemplated by Rules 56(c) and 56(e) of the *Federal Rules of Civil Procedure.* Specifically, the article at issue does not constitute deposition testimony, an answer to an interrogatory, nor a response to a request for admissions. Moreover, the article was not in proper affidavit form. For instance, the article was not sworn or certified, as required by Rule 56(e). *See Gordon v. Watson,* 622 F.2d 120, 122 (5th Cir.1980) (citations omitted). In fact, the unverified article is inadmissible hearsay. *Soles v. Board of Comm'rs of Johnson County,* 746 F.Supp. 106, 110 (S.D.Ga.1990) (In determining admissibility under Rule 56, the court may consider only evidence that would be admissible at trial.). Accordingly, the court finds that Sheriff Chapman and Deputy Thompson's motion to strike is due to be granted. Consequently, the court will not consider said article in its analysis of the motions for summary judgment.

### II. 42 U.S.C. § 1983—Fifth, Eighth and Fourteenth Amendments

■ In his amended complaint, the plaintiff alleges that the defendants subjected Mr.

Dowdell to cruel and unusual punishment in violation of the Eighth Amendment, as enforced by 42 U.S.C. § 1983.[3] Pl.'s Amend. Compl. However, the defendants contend that the Eighth Amendment is inapplicable to this case because Mr. Dowdell was not convicted of a crime.

■ It is well established that the Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, was aimed to protect persons convicted of crimes from cruel and unusual punishment. *United States v. Lovett*, 328 U.S. 303, 317–18, 66 S.Ct. 1073, 1079–80, 90 L.Ed. 1252 (1946); *Powell v. Texas*, 392 U.S. 514, 531–32, 88 S.Ct. 2145, 2153–54, 20 L.Ed.2d 1254 (1968); *Ingraham v. Wright*, 430 U.S. 651, 664 & 671 n. 40, 97 S.Ct. 1401, 1408, 1412 n. 40, 51 L.Ed.2d 711 (1977); *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Whitley v. Albers*, 475 U.S. 312, 318, 106 S.Ct. 1078, 1083, 89 L.Ed.2d 251 (1986); *Wilson v. Seiter*, 501 U.S. 294, 296–97, 111 S.Ct. 2321, 2322–23, 115 L.Ed.2d 271 (1991); *Gilmere v. City of Atlanta*, 737 F.2d 894, 905 (11th Cir.1984), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 *cert. denied*, 476 U.S. 1124, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986). As stated in *Ingraham*, "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."[4] 430 U.S. at 671 n. 40, 97 S.Ct. at 1412 n. 40. The court's independent re-

search reveals that the only cases where courts have extended the Eighth Amendment boundaries beyond application to convicted criminals involve pretrial detainees and those institutionalized for mental disabilities. *See Wheeler v. Glass*, 473 F.2d 983 (7th Cir.1973); *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974). Hence, the Eighth Amendment has no application here. Accordingly, the court finds that the plaintiff's claims pursuant to the Eighth Amendment are without merit.

■ In addition, the court finds that the plaintiff's Fifth Amendment claims must fail. The Fifth Amendment's Due Process Clause applies only to the federal government. *Knoetze v. United States*, 634 F.2d 207, 211 (5th Cir.), *cert. denied*, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981) (citing *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). Local governments, on the other hand, are subject to the Due Process Clause of the Fourteenth Amendment. However, both the Supreme Court of the United States and the Eleventh Circuit have held that all claims "involving allegations of the use of excessive force in an arrest, an investigatory stop, or any other seizure, should be analyzed under the Fourth Amendment" rather than under the substantive due process standard of the Fourteenth Amendment.[5] *Tinney v. Shores*, 77 F.3d 378, 381 (11th Cir.1996) (summarizing *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *see also Hamm v. Powell*, 893 F.2d 293, 294 (11th Cir.), *cert. denied*, 496 U.S. 938, 110 S.Ct. 3218, 110

---

**3.** The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

**4.** The *Ingraham* court refused to apply the Eighth Amendment to disciplinary paddling of school children.

**5.** The court is somewhat confused by the Eleventh Circuit's footnote in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), wherein the court stated that cases such as *Gilmere v. City of Atlanta*, 774 F.2d 1495, *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 *cert. denied*, 476 U.S. 1124, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986), are still subject to suit under § 1983 based on substantive due process grounds. 20 F.3d at 1560 n. 15.

*Gilmere* involved a situation where a police officer beat, shot and killed an individual in making an arrest. Because the court cannot reconcile the dicta in *McKinney* with the holdings in *Graham* and *Tinney*, which were decided subsequent to *Gilmere*, the court determines that only the Fourth Amendment governs this action. *See infra* p. 543. However, even if the court were to find that the plaintiff's substantive due process claims were viable based on the dicta in *McKinney*, these claims would fail for the same reasons indicated in this opinion concerning the Fourth Amendment claims. Additionally, the court finds that these claims would fail because Officer Ward and Deputy Thompson's reaction to Mr. Dowdell's violent behavior does not "shock[] the conscience" or offend ... hardened sensibilities." *See O'Neal v. DeKalb County*, 850 F.2d 653, 657 (11th Cir.1988) (citation omitted).

L.Ed.2d 665 (1990). In *Tinney,* the Eleventh Circuit followed the Supreme Court's guidance in *Graham* restricting the contours of the Fourteenth Amendment's Substantive Due Process Clause. 77 F.3d at 381. In interpreting Supreme Court case law, the Eleventh Circuit held that where the alleged violative actions fall within the purview of a particular Amendment, a plaintiff may only bring a constitutional claim under that Amendment and may not invoke the more general provisions of the Fourteenth Amendment's Substantive Due Process Clause. *Id.* (citing *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871); *see also Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation and the right to bodily integrity....").

Based on the foregoing, the court finds that the plaintiff has failed to assert a cognizable constitutional claim under the Fifth, Eighth or Fourteenth Amendments. The court further finds that the Fourth Amendment's prohibition of unreasonable searches and seizures governs Mr. Dowdell's rights in this case. *See Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993) (holding that the Fourth Amendment applies to involuntary commitment seizures); *Maag v. Wessler,* 960 F.2d 773, 775 (9th Cir.1991) ("Although there are few decisions that discuss the Fourth Amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest...."). Consequently, the court will analyze Mr. Dowdell's allegations under the Fourth Amendment's "objective reasonableness" standard.[6]

## III. 42 U.S.C. § 1983—Fourth Amendment

### A. Town of Notasulga

The plaintiff alleges that the Town of Notasulga violated 42 U.S.C. § 1983, which accords private citizens recourse in the wake of constitutional deprivations carried out by individuals acting under the color of state law.[7] Specifically, the plaintiff alleges violations of Mr. Dowdell's rights under the Fourth Amendment as enforced by 42 U.S.C. § 1983.[8] The plaintiff contends that the Town of Notasulga failed to properly train and supervise Officer Ward, resulting in the use of excessive force against Mr. Dowdell. Pl.'s Amend.Compl. at ¶ 39.

▆▆ A local governing body can be sued directly under § 1983 for monetary, declaratory or injunctive relief when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body." *Monell v. Department of Social Services of New York City,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Furthermore, local governing bodies may be sued for constitutional deprivations emanating from "custom" although such a custom is not the product of formal adoption via the body's official deci-

---

6. In *Graham, supra,* the Supreme Court of the United States stated that the "objective reasonableness" standard requires the trier of fact to view an officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396, 109 S.Ct. at 1872. The Court further instructed the lower court to focus on the "reasonableness at the moment." *Id.* The Court emphasized that

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. at 1872–73 (internal citation and quotations omitted).

7. Section 1983 provides in relevant part that:

> "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured...."

42 U.S.C. § 1983.

8. The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures shall not be violated."

sionmaking regime.[9] *Id.* at 690–91, 98 S.Ct. at 2035–36. Thus, in order to recover against the Town of Notasulga, the plaintiff must demonstrate that the alleged constitutional deprivation occurred pursuant to a custom or policy of the municipality. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1503 (11th Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *Hearn v. City of Gainesville,* 688 F.2d 1328, 1334 (11th Cir.1982).

▮▮▮▮ In limited circumstances, a municipality's "failure to train" its officials can give rise to a viable § 1983 action. *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). In *City of Canton,* the Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204. Therefore, to prevail under his § 1983 action, the plaintiff must demonstrate that the Town of Notasulga's alleged omission(s) and/or commission(s) in failing to adequately train Officer Ward evidences a "deliberate" or "conscious" decision not to so train. *See id.* at 389, 109 S.Ct. at 1205. As stated in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality): "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made among various alternatives" by local policymakers. 475 U.S. at 483, 106 S.Ct. at 1300 (quoted in *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205).

▮▮▮▮ Before a municipality can be said to have made a "deliberate choice among alternative courses of action, its policymakers

must have had 'actual or constructive notice that the particular omission is substantially certain to result in the deprivation of the constitutional rights of their citizens.' " *Young v. City of Augusta,* 59 F.3d 1160, 1172 (11th Cir.1995) (quoting *City of Canton,* 489 U.S. at 396, 109 S.Ct. at 1208). The plaintiff may demonstrate actual or constructive notice by showing either: (1) that the need for a particular type of training is obvious because the employees face clear constitutional duties in *recurrent situations* or (2) "that the need for more or better training is obvious because *a pattern of constitutional violations* exists such that the municipality knows or should know that the corrective measures are needed." *Young,* 59 F.3d at 1172 (emphasis added). The Eleventh Circuit has also commented that

> [t]o prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law. In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.

*Id.* (internal quotations omitted) (citations omitted).

For example, in *Young,* numerous inmates had complained of a lack of adequate treatment for serious medical problems stemming from mental illness. *Id.* Moreover, the mistreatment suffered by the plaintiff occurred over a period of several months. *Id.* at 1172–73. Therefore, the court concluded that an inference of deliberate indifference existed. *Id.* at 1173. Also, in *Vineyard v.*

---

**9.** In *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court of the United States stated:

> "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."

*Id.* at 167–68, 90 S.Ct. at 1613–14. The Court has also explained that

> "[i]t would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice ... can establish what is state law.... Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text."

*Nashville C. & St. Louis Ry. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940).

*County of Murray,* 990 F.2d 1207 (11th Cir. 1993), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993), the court found that § 1983 liability properly attached to the county for its failure to train employees. In *Vineyard,* there was evidence that the Sheriff's Department received complaints about its officers but did not record them in any manner. *Id.* at 1212.

However, a § 1983 plaintiff cannot rely on a theory of *respondeat superior* to hold a city liable for the individual actions of its police officers. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036; *Hearn,* 688 F.2d at 1334; *Saville v. Houston County Healthcare Auth.,* 852 F.Supp. 1512, 1534 (M.D.Ala. 1994). Neither can a municipality be held liable "solely because it employs a tortfeasor." *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991) (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036). Therefore, a plaintiff's actions against a municipal entity will prevail only if a causal link is established between an official policy or custom and the plaintiff's injury. *Byrd v. Clark,* 783 F.2d 1002, 1008 (11th Cir.1986). In fact, the statutory language of § 1983 necessitates proof of an affirmative causal connection between the actions taken under color of state law and the constitutional deprivation. *See Williams v. Bennett,* 689 F.2d 1370 (11th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

The Town of Notasulga contends that Officer's Ward's training and disciplinary records prove that he was properly trained. For instance, Officer Ward completed the requirements of Ala.Code § 36–21–46, which mandates the completion of 240 hours of formal police training in a recognized police training school. Aff. of Miller; Aff. of Fernandes. In addition to this minimum training, Officer Ward also attended other training programs, including but not limited to the F.B.I. Firearms Instructor School, which is an eighty-hour course in the use of firearms. Aff. of Miller. Officer Ward also has attended two programs sponsored by the Department of Mental Health—six hours on "Handling the Emotionally Disturbed" and eight hours on "Stress Management." Aff. of Fernandes. Moreover, while employed with the Notasulga Police Department, Officer Ward never engaged in, nor was he disciplined for, any type of improper or inappropriate police conduct or behavior. Aff. of Miller. In fact, Officer Ward has never been involved in an incident with the Notasulga Police Department where he fired his weapon. Aff. of Miller.

However, the plaintiff contends that Officer Ward was inadequately trained because he could not recall in his deposition any of his training on handling the mentally ill. In his deposition, Officer Ward states that his only training in handling the mentally ill occurred while he was at the Montgomery Police Academy. Ward Dep. at 30. The court does find the plaintiff's argument in this regard highly persuasive. However, whether this amounted to "deliberate indifference" by the Town of Notasulga or constituted the moving force behind Mr. Dowdell's death warrants further analysis.

As such, the court will next address whether the Town of Notasulga's policies, or lack thereof, constitute deliberate indifference to the rights of individuals such as Mr. Dowdell. The court notes that the responsibility for enforcement of court orders, such as the "pickup" order in this case, rests with the Sheriff's Department of the respective county. Ala.Code § 36–22–3 (duty of sheriff to execute and return process and orders of the court). The evidence also demonstrates that it was not the regular practice of the Notasulga Police Department to pick up mentally ill persons or assist in the pickup of mentally ill persons. *See* Def. Town of Notasulga's Reply Br. at 5. More importantly though, the plaintiff has not presented any evidence of other individuals, similar to Mr. Dowdell, who have attempted to shoot, or resist in any manner, a Notasulga police officer when such an officer approaches the individuals on involuntary commitment orders.

In addition, Deputy Thompson, who has worked approximately five years for the Lee County Sheriff's Department and has participated in the service of numerous mental "pickup" orders, has never had an individual, such as Mr. Dowdell, attempt to run from him. Thompson Dep. at 10 & 27. In fact, he has never had to fire his weapon at a mental-

ly ill patient who refused to go with him. *Id.* at 58 & 85–86. Moreover, Sheriff Chapman, who has been Sheriff of Lee County for approximately fifteen-and-a-half years and has approximately forty-five years of law enforcement experience, has never been connected with an incident where an individual to be picked up on an involuntary commitment order reacted as Mr. Dowdell did. Chapman Dep. at 7, 13 & 14.

Based on the foregoing, the court finds that there is no evidence that the Town of Notasulga had actual or constructive notice that any particular omission was substantially certain to result in a violation of Mr. Dowdell's constitutional rights. *See Young v. City of Augusta,* 59 F.3d 1160, 1172 (11th Cir.1995). Thus, this single and isolated occurrence—even if the court concluded that the Town of Notasulga's conduct was unconstitutional—cannot be the basis of a viable action predicated on § 1983 because such an unusual occurrence does not rise to the level of "deliberate indifference" necessary to succeed on a claim for failure to adequately train police officers. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributable to a municipal policymaker."). To find otherwise would be analogous to holding the Town of Notasulga liable under the theory of *respondeat superior* than for actions directly attributable to it. Such a finding is in direct conflict with *Monell* and its progeny.

The plaintiff points to the fact that the Town of Notasulga did not have a written policy for handling "mental pickups." However, the court finds that the mere fact that the Town of Notasulga did not have a written policy does not amount to deliberate indifference to the needs of Mr. Dowdell. *See Schmelz v. Monroe County,* 954 F.2d 1540, 1544 (11th Cir.1992) (the mere fact that the Sheriff did not have a written policy for dealing with suicidal inmates was not inadequate training and did not amount to deliberate indifference to the needs of inmates). The court notes that, at best, a municipality should clothe well-trained police officers with the authority to react in a manner dictated by the circumstances and train them in a manner which will engender and facilitate professional decorum and eliminate the likelihood of constitutional deprivations. The court is convinced that the Town of Notasulga's "custom" and "policy" regarding its police department accomplishes these salient and indispensable objectives, even without a specific written policy on executing mental commitment orders.

For example, the plaintiff argues that the Town of Notasulga had a barricade policy, but provided no training in its enforcement. However, the Town of Notasulga contends that Officer Ward did follow the procedures set out in the barricade policy. The policy requires officers to "seal avenues of escape and call for assistance." *See* Def. Town of Notasulga's Ans. to Pl.'s First Set of Interrogatories—Notasulga Police Department Guideline 568 (attach. to Town of Notasulga's Br. in Supp. of Mot. for Summ.J.). The undisputed evidence clearly reveals that Officer Ward took cover, sealed the door to prevent the escape of Mr. Dowdell and radioed for backup assistance. Thus, based on the undisputed evidence, the court finds that Officer Ward acted within the guidelines of the Notasulga Police Department. Moreover, the court further finds that the policy was clearly sufficient for the type of situation presented here.

■ Even if there were disputed evidence of deliberate indifference, the court finds that the plaintiff's § 1983 claim against the Town of Notasulga must fail because there is no causal connection between the actions of Officer Ward and the alleged negligent death of Mr. Dowdell. Consequently, there is no affirmative causal connection between the alleged negligent training and/or supervision and the alleged violations of 42 U.S.C. § 1983. There is simply no evidence that Officer Ward used any type of force against Mr. Dowdell. It is undisputed that Officer Ward did not fire his weapon during the incident at issue. Aff. of Ward; Aff. of Corporal Wright. In fact, it is undisputed

that Officer Ward did not have any physical contact whatsoever with Mr. Dowdell. Instead, Officer Ward radioed for backup pursuant to the Notasulga Police Department guidelines.

■ The court further finds that actions by a county official may not be imputed to a city when there is no proof that the latter ratified or authorized the actions of the former. Here, there is simply no proof that the Town of Notasulga endorsed, encouraged or facilitated Deputy Thompson's actions on August 16, 1993—the day on which Mr. Dowdell died. Neither have the plaintiffs demonstrated that the two entities routinely act in concert to deprive private citizens of their constitutionally guaranteed rights. Based on the foregoing, the Town of Notasulga's motion for summary judgment on the plaintiff's § 1983 claim against it is due to be granted.

### B. Lee County

■ The plaintiff attempts to hold Lee County liable for the actions and/or inactions of Sheriff Chapman and Deputy Thompson. The only issue presented by Lee County's motion for summary judgment is whether a sheriff or deputy sheriff is a policymaker for the county with respect to law enforcement activities. If the answer is in the negative, then Lee County's motion for summary judgment is due to be granted.

■ In § 1983 actions, county commissions cannot be held liable under a theory of *respondeat superior*. *Swint v. City of Wadley*, 5 F.3d 1435, 1450 (11th Cir.1993)

(hereafter "*Swint I*") (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)), *modified on other grounds*, 11 F.3d 1030 (11th Cir.1994), *vacated on jurisdictional grounds sub nom. Swint v. Chambers County Comm'n*, — U.S. —, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), *on remand*, 51 F.3d 988 (11th Cir.1995).[10] However, the county may be subjected to § 1983 liability for the acts of an official who possesses final authority to establish policy with respect to the action ordered if the deprivation was undertaken pursuant to such policy. *Id.* " 'Whether a particular official has final policymaking authority is a question of state law.' " *Id.* (quoting *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991)); *see also Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989).

■ Under Alabama law, the sheriff is an executive officer of the State of Alabama. Ala. Const. of 1901, Art. V, § 112. The Supreme Court of Alabama has held that a sheriff is not an employee of the county for purposes of imposing liability on the county under a *respondeat superior* theory. *Swint I*, 5 F.3d at 1450 (citing *Parker v. Amerson*, 519 So.2d 442, 442 (Ala.1987)). In determining whether the sheriff is a policymaker for the county, the *Swint I* court noted that the pivotal point is whether a sheriff "was exercising county power with final authority when he [or she] authorized the law enforcement [action at issue]."[11] *Id.* (quotation

---

10. *Swint I* was vacated by the Supreme Court of the United States holding that the Eleventh Circuit had no pendent appellate jurisdiction with which to consider the appeal by the Chambers County Commission. *See Chambers County Comm'n*, — U.S. —, 115 S.Ct. 1203, 131 L.Ed.2d 60; *City of Wadley*, 51 F.3d at 1002. Although *Swint I* has been vacated, the court finds that its reasoning is still sound. In fact, federal district courts in Alabama have uniformly adopted the Eleventh Circuit's reasoning in *Swint I. See infra* pp. 548–549.

11. The plaintiff argues that *Swint I* and cases following its reasoning are irrelevant because the actions herein were not pursuant to law enforcement but pursuant to the doctrine of *parens patriae*. In support thereof, the plaintiff relies on *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala. 1974). In *Lynch*, the court stated that "[c]om-

mitment on account of dangerousness to others serves the police power, while commitment for dangerousness to self partakes of the *parens patriae* notion that the state is the ultimate guardian of those of its citizens who are incapable of caring for their own interests." *Id.* at 390–91 (citing *In re Ballay*, 482 F.2d 648, 658 (1973)). In accordance with *Lynch*, because the commitment was on account of Mr. Dowdell's dangerousness to his wife, the court finds that the law enforcement officials were acting pursuant to the police power. In any event, the court finds the plaintiff's argument in this regard wholly without merit because, regardless of the reasons for Mr. Dowdell's commitment, the law enforcement officials were acting pursuant to general law enforcement authority—the authority, including the duty, to carry out involuntary mental commitment pick-up orders.

omitted). The *Swint I* court noted that under Alabama law, it is:

the duty of sheriffs in their respective counties, by themselves or deputies, to "ferret out crime, to apprehend and arrest criminals and, insofar as within their power, to secure evidence of crimes in their counties and to present a report of the evidence so secured to the district attorney or assistant district attorney for the county."

*Id.* (quoting Ala.Code § 36–22–3(4)). After reviewing the law and the arguments, the court in *Swint I* held as follows:

The Commission contends that no similar law enforcement duty or authority has been bestowed upon the County itself. We agree. Plaintiffs have not cited us to any statutes or decisions indicating that Alabama counties, and their governing commissions, have law enforcement authority or duties. Because Alabama counties are "authorized to do only those things permitted or directed by the legislature of Alabama," *Lockridge v. Etowah County Comm'n,* 460 So.2d 1361, 1363 (Ala.Civ. App.1984), and because the State has not assigned the counties any law enforcement authority, the sheriff is not exercising county power when he authorizes a raid on suspected criminal activity within his county.... We hold that Sheriff Morgan is not the final repository of Chambers County's general law enforcement authority, because it has none. Therefore, the County Commission is not liable for the Sheriff's law enforcement actions under 42 U.S.C. § 1983, and it is entitled to summary judgment on the § 1983 claims.

5 F.3d at 1450–51.

The federal district courts in Alabama have uniformly found that the sheriff is not the final policymaker for the county with respect to law enforcement activities. In *Hope v. City of Hueytown,* No. CV–92–N–0126–S, slip op. (N.D.Ala.1992) (Nelson, J.), *aff'd without opinion,* 56 F.3d 1389 (11th Cir.1995) (attach. in Def. Lee County's Mot. to Supplement), the court held that neither a sheriff nor a deputy sheriff can act as the ultimate repository of county authority with respect to law enforcement activity because the county has no statutory authority to ferret out crime or to apprehend and arrest criminals. *Id.* at 20–23; *see also Forehand v. Roberts,* No. Civ. 92–A–601–N, slip op. at 2–3, 1992 WL 554241 (M.D.Ala. Aug. 11, 1992) (Albritton, J.); *Smith v. Arndt,* No. CV–92–H–1227–NE, slip op. at 2–3, 1992 WL 547727 (N.D.Ala. July 14, 1992) (Hancock, J.); *Sanders v. Miller,* 837 F.Supp. 1106, 1109–10 (N.D.Ala.1992). Moreover, after *Swint I*'s release, two decisions in this district, including one decided by this court, have held that the sheriff is not the final repository of county law enforcement authority because the county has no law enforcement activity. *See Cofield v. Randolph County Comm'n,* 844 F.Supp. 1499, 1501–02 (M.D.Ala.1994); *McMillian v. Johnson,* No. CV–93–A–699–N, slip op. at 28–35, 1994 WL 904652 (M.D.Ala. Feb. 18, 1994) (Albritton, J.), *appeal filed* No. 95–6369 (11th Cir.1995) (attach. in Def. Lee County's Mot. to Supplement). This court in *Cofield* also stated that "[b]ecause the sheriff has the exclusive authority to hire, fire, and train deputies, a county ... may not be held liable for failing to train a deputy sheriff." 844 F.Supp. at 1501.

Moreover, the court in *McMillian* interpreted the Supreme Court of Alabama's decision in *King v. Colbert County,* 620 So.2d 623 (Ala.1993), "to mean that an Alabama county cannot be held liable for the actions of a state official unless the county has statutory authority over the area of government in which the official acted." *McMillian,* No. CV–93–A–699–N at 51. Therefore, the court in *McMillian* dismissed several theories of county liability because the plaintiff failed to cite a statute granting Alabama counties law enforcement authority. *Id.* at 52. Even after *Swint I* was vacated by the Supreme Court, one court in this district has followed the reasoning of the Eleventh Circuit and dismissed counts in two separate lawsuits against law enforcement officials. *See Warren v. Coffee County,* No. 95–T–242–S, slip. op. at 13 (M.D.Ala. Aug. 9, 1995) (Thompson, J.) (attach. in Def. Lee County's Mot. to Supplement); *Wilson v. Lowndes County,* 95–T–668–N, slip op. at 1 (M.D.Ala. Aug. 28, 1995) (Thompson, J.) (attach. in Def. Lee County's Mot. to Supplement).

Based on the foregoing, the court finds that Lee County had no duty to train or supervise Sheriff Chapman or Deputy Thompson. Moreover, the court finds that Sheriff Chapman is not the final repository of Lee County's general law enforcement authority, because Lee County has none. The court further finds that Lee County may not be held liable on the theory of *respondeat superior* for the acts of Sheriff Chapman or Deputy Thompson. Therefore, Lee County is not liable for Sheriff Chapman or Deputy Thompson's law enforcement actions under 42 U.S.C. § 1983. Accordingly, the court concludes, without question, that the plaintiff may not prevail against Lee County. Consequently, Lee County's motion for summary judgment is due to be granted on the § 1983 claims asserted against it.

### C. Officer Ward, Sheriff Chapman and Deputy Thompson

#### 1. *Individual Capacities*

##### i. *Deprivation of a Constitutional or Federal Right*

 Before the court addresses qualified immunity, it will determine whether the plaintiff has alleged a constitutional violation by Officer Ward, Sheriff Chapman or Deputy Thompson. *See Tinney,* 77 F.3d at 381 (citing *Wooten v. Campbell,* 49 F.3d 696, 699 (11th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995); *Jordan v. Doe,* 38 F.3d 1559, 1564 (11th Cir.1994)); *see also Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (Before a court can grant qualified immunity, it first should determine whether a constitutional right has been violated.); *cf. Spivey v. Elliott,* 41 F.3d 1497, 1498 (11th Cir.1995) ("[W]e now think it enough to decide that there was no clearly established constitutional right allegedly violated by the defendants."). A § 1983 claim is predicated on two indispensable elements: first, the conduct complained of must have been committed by a person acting under state law; second, this conduct must have deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Whitehorn v. Harrelson,* 758 F.2d 1416, 1419 (11th Cir.1985) (citation omitted)); *see also*

*supra* note 4. It is undisputed that the defendants were acting under color of state law at all material times.

 The analysis of the Fourth Amendment's prohibition of excessive force as alleged against Deputy Thompson has been succinctly summarized by the Eleventh Circuit as follows:

> [T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. Reasonableness is determined by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.

*O'Neal v. DeKalb County,* 850 F.2d 653, 657 (11th Cir.1988) (internal quotations and citations omitted). Generally, subject to qualified immunity, the reasonableness of the force used by a law enforcement official is a question for the jury, and the relevant inquiry is " 'whether the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting [him or her], without regard to [his or her] underlying intent and motivation.' " *Samples v. City of Atlanta,* 916 F.2d 1548, 1550 (11th Cir.1990) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)); *see also Acoff v. Abston,* 762 F.2d 1543, 1548 (11th Cir.1985) (Question in § 1983 action whether police officer was constitutionally justified in using deadly force against the plaintiff was for the jury, at least as to officer who actually fired the shot.); *Hamilton v. Chaffin,* 506 F.2d 904, 912 (5th Cir.1975). As such, construing the facts most favorable to the plaintiff, the court finds that the plaintiff has alleged a constitutional violation against Deputy Thompson. However, Deputy Thompson may still prevail on summary judgment if this constitutional right was not clearly established on August 16, 1993. *See infra* pp. 550–552.

 The plaintiff has named Sheriff Chapman as a defendant simply because he is the Sheriff of Lee County and the supervisor of Deputy Thompson. Sheriff Chapman was not present during the incident about

which the plaintiff complains. As noted above, the only claim which remains is the plaintiff's excessive force claim. The sheriff can be liable to the plaintiff on the excessive force claim only if the plaintiff can prove that Deputy Thompson's alleged use of excessive force is somehow causally connected to some action or inaction on the part of the sheriff. *See Greason v. Kemp,* 891 F.2d 829, 837 (11th Cir.1990). Essentially, the plaintiff alleges that Sheriff Chapman lack knowledge of any controlling policy concerning the execution of involuntary commitment orders by the Lee County Sheriff's Department. Construing the evidence in the light most favorable to the plaintiff, the court finds that the plaintiff has, perhaps, produced minimal evidence from which it could possibly be found or inferred that Sheriff Chapman's actions or inactions had something to do with the actions of Deputy Thompson. Accordingly, the court finds that the plaintiff has also alleged a constitutional violation against Sheriff Chapman. Similar to Deputy Thompson, Sheriff Chapman may still prevail on summary judgment if this constitutional right was not clearly established on August 16, 1993. *See infra* pp. 550–552.

■■■■ However, since there is no evidence that Officer Ward shot Mr. Dowdell or was in any way liable for Deputy Thompson's actions, the court finds that the plaintiff has failed to allege a constitutional violation against Officer Ward. *See Acoff,* 762 F.2d at 1548 n. 5; *see also* Ward's Br. in Supp. of Mot. for Summ.J. at 6–7 (undisputed that Officer Ward did not use any type of force against Mr. Dowdell). In making this determination, the court rejects any contention by the plaintiff that Officer Ward should have immediately taken Mr. Dowdell into custody without identifying himself or Deputy Thompson or informing Mr. Dowdell of the purpose of the visit. *See Calamia v. City of New York,* 879 F.2d 1025 (2d Cir.1989) (excessive force claim was properly submitted to the jury where the plaintiff was shoved to the floor and immediately cuffed as soon as he answered the door); *Gutierrez–Rodriguez v.*

*Cartagena,* 882 F.2d 553 (1st Cir.1989) (officers who approached the suspect's vehicle without identifying themselves as police officers liable for reckless or callous indifference to constitutional·rights of the individual). In the absence of the deprivation of a constitutional or federal right, the plaintiff's § 1983 claim against Officer Ward, both in his official and individual capacity, must fail.[12]

### ii. Qualified Immunity

■■■■ The defendants also argue that even if evidence exists which supports a constitutional violation, they are still entitled to qualified immunity, which extinguishes liability for any and all claims against them in their individual capacity. A § 1983 litigant must overcome the onerous burden of defeating the qualified immunity defense in order to recover monetary damages from the pocket of a government official. The basis of the qualified immunity defense is firmly established:

> When a plaintiff sues a municipal officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer. If sued "individually," a municipal officer may raise an affirmative defense of good faith, or "qualified," immunity.

*Swint v. City of Wadley,* 51 F.3d 988, 994 (11th Cir.1995) (quoting *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991)). In fact, based upon the case law in this circuit, perhaps a more appropriate name for this defense would be "unqualified immunity." The issue of whether the defendants are entitled to qualified immunity may be properly determined on a pretrial motion for summary judgment under Rule 56 of the *Federal Rules of Civil Procedure.*

■■■ For the plaintiff to defeat the defendants' motion for summary judgment based on qualified immunity, he must show that the defendants are not entitled to qualified immunity as a matter of law or that genuine issues of material fact exist so that the determination of whether the defendants are entitled to qualified immunity is only properly

---

12. In the alternative, assuming a constitutional violation exists, the court finds that Officer Ward is entitled to qualified immunity concerning claims against him in his individual capacity. *See infra* pp. 550–552.

determined after findings of fact have been made by the jury. *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir.1988). However, even disputes over genuine issues of material fact will not "preclude summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions." *Id.* at 1564.

The Supreme Court of the United States has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Rich*, 841 F.2d at 1563 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)); *see also Ansley v. Heinrich*, 925 F.2d 1339, 1348 (11th Cir.1991). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis, which the court will refer to as the *Zeigler* paradigm or test. A government official first must demonstrate that " 'he [or she] was acting within the scope of his [or her] discretionary authority when the allegedly wrongful acts occurred.' " *Rich*, 841 F.2d at 1563–64 (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983)). "Once the defendant public official satisfies his [or her] burden of moving forward with the evidence, the burden shifts to the plain-

tiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional law.' " *Rich*, 841 F.2d at 1563–64 (quoting *Zeigler*, 716 F.2d at 849).

Whether applicable law was clearly established at the time of the challenged action is determined by reference to decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit and the Supreme Court of Alabama. *D'Aguanno v. Gallagher*, 50 F.3d 877, 881 n. 6 (11th Cir.1995); *Courson v. McMillian*, 939 F.2d 1479, 1498 & n. 32 (11th Cir.1991). The relevant inquiry is "fact specific," *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir.1994) (DeMent, J.),[13] and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter*, 28 F.3d at 1150. As emphasized in *Lassiter*, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violated federal law *in the circumstances*." *Lassiter*, 28 F.3d at 1150 (emphasis in original); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right"). In other words, "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Rodgers*, 39 F.3d at 311 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir.

---

13. In *Rodgers*, the Eleventh Circuit reversed this court's order denying the defendants qualified immunity on a motion for summary judgment. The Eleventh Circuit's inquiry in that case demonstrates the factual depth required for determining whether the law was clearly established: The question in this case is not whether, in general, involuntarily committed patients have a legally cognizable interest under the Fourteenth Amendment to safe conditions. They do. Instead, the question in this case, as in all qualified immunity cases, is fact specific: in May 1991, was it clearly established in this circuit that it was unconstitutional for a mental institution to fail to supervise a patient for fifteen minutes in the smoking room when she was on close watch status for a health problem, when the institution had a history of some "sexual contact" involving patients other than plaintiff but no history of rape for the past twelve years, where a previous patient who was to be similarly monitored disappeared, apparently escaped through a bathroom window, and fell to her death on a ledge below, and where the plaintiff had never before complained of unwanted sexual contact from either the patient accused, any other patient, or any member of the staff? The answer is "NO." 39 F.3d at 311.

1993), *modified*, 14 F.3d 583 (11th Cir.1994)). The plaintiff cannot rely on "general conclusory allegations" or "broad legal truisms." *City of Fort Lauderdale*, 7 F.3d at 1557 (quoting *Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989)); *see also Adams v. St. Lucie County Sheriff's Dep't*, 962 F.2d 1563, 1574–75 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc*, 998 F.2d 923 (11th Cir.1993); *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir.1987).

■ The evidence is undisputed that the law enforcement officials were performing discretionary functions. Therefore, the court finds that the defendants have met their burden of proving that each of them was acting within his official capacity during the conduct in question. The first step of the *Zeigler* paradigm having been completed, the burden of proof now shifts to the plaintiff.

As to the second prong of the *Zeigler* test, i.e., that the defendants' conduct violated a clearly established constitutional law, the plaintiff does not cite any case clearly establishing that the officers conduct at issue violated the law on August 16, 1993. Because neither the Eleventh Circuit, the Supreme Court of the United States, nor the Supreme Court of Alabama has considered facts and circumstances which are *closely* analogous to those in the case at bar, the court finds that it is not clearly established that the law enforcement officials' actions constituted a Fourth Amendment violation. Accordingly, the court finds that Officer Ward, Sheriff Chapman and Deputy Thompson are entitled to qualified immunity as to the § 1983 claims asserted against them in their individual capacities.

### 2. *Official Capacities*

The plaintiff also sues all three law enforcement officials in their official capacities. Sheriff Chapman and Deputy Thompson contend that the Eleventh Amendment bars all federal law claims brought against them in their official capacities. The plaintiff failed to respond to this contention.

■ Generally, "an action against an official in his official capacity imposes liability on the entity that official represents," assuming that entity received notice and an opportunity to be heard. *Parker v. Williams*, 862 F.2d 1471, 1475 (11th Cir.1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 877–78, 83 L.Ed.2d 878 (1985)). The Eleventh Amendment insulates a state from suit in federal court unless the state either consents to suit or waives its Eleventh Amendment immunity. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 98–100, 104 S.Ct. 900, 906–08, 79 L.Ed.2d 67 (1984).[14] The Eleventh Amendment does not shield state officials acting in their official capacity from prospective injunctive relief. *Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). However, "regardless of the entity named as defendant, the Eleventh Amendment bars retroactive damage awards which must be paid by the state." *Parker*, 862 F.2d at 1475–76 (citing *Quern v. Jordan*, 440 U.S. 332, 338, 99 S.Ct. 1139, 1144, 59 L.Ed.2d 358 (1979)).

■ As discussed *supra*, under the circumstances presented here, Sheriff Chapman and Deputy Thompson are state rather than county officials. *See supra* pp. 26–29. In *Parker v. Amerson*, 519 So.2d 442 (Ala.1987), the Eleventh Circuit certified the following inquiry to the Alabama Supreme Court: "[w]hether the sheriff of a county may be considered an 'employee' of the county for the purposes of imposing liability on the county under the theory of respondeat superior." The Alabama Supreme Court responded in the negative and stated,

"[a] sheriff is not an employee of a county for purposes of imposing liability on the

---

**14.** A state may also be sued in federal court if Congress overrides the states' immunity pursuant to its authority under § 5 of the Fourteenth Amendment. *Pennhurst*, 465 U.S. at 99, 104 S.Ct. at 907. The Supreme Court of the United States has determined that Congress did not remove states' immunity in enacting § 1983.

*Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979); *see also Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that states are not "persons" within the meaning of § 1983).

county under a theory of respondeat superior. A sheriff is an executive officer of the State of Alabama, who is immune from suit under Article I, § 14, Alabama Constitution of 1901, in the execution of the duties of his office, except for actions brought (1) to compel him to perform his duties, (2) to compel him to perform ministerial acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a necessary party for the construction of the statute." *Parker v. Amerson,* 519 So.2d at 442–443.

Here, the plaintiff is suing, in part, Sheriff Chapman and Deputy Thompson in their official capacity for retrospective damages in the form of compensatory and punitive damages. However, the State of Alabama has neither consented to suit nor waived its immunity. Moreover, the plaintiff does not even allege that Sheriff Chapman or Deputy Thompson's conduct fell within the ambit of one of the exceptions articulated in the Supreme Court of Alabama's response to the certified question in *Parker v. Amerson.* As such, the court finds that, pursuant to the Eleventh Amendment, Sheriff Chapman and Deputy Thompson are immune from suit in their official capacities, except for certain actions seeking injunctive or declaratory relief. *See Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989) (Eleventh Amendment barred a § 1983 action for compensatory and punitive damages against an Alabama sheriff in his official capacity.).

 The court notes that the plaintiff does seek an injunction and declaratory judgment in each claim for relief. In this regard, the defendants correctly point out that injunctive and declaratory judgment actions concern future conduct and injuries. *See Church v. City of Huntsville,* 30 F.3d 1332, 1336 (11th Cir.1994) (injunctive relief); *Emory v. Peeler,* 756 F.2d 1547, 1552 (11th Cir. 1985) (declaratory judgment). Therefore, a party who does not face a real and immediate threat of future injury lacks standing to seek either injunctive or declaratory relief.

*Church,* 30 F.3d at 1336; *Emory,* 756 F.2d at 1552. Because the plaintiff's claims are based on the death of Mr. Dowdell, the court finds that the plaintiff has no standing to obtain declaratory or injunctive relief because Mr. Dowdell faces no threat of future harm from any defendant. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (holding plaintiff not entitled to equitable relief, absent real and immediate threat of injury from excessive police force). Based on the foregoing, the court finds that all claims against Sheriff Chapman and Deputy Thompson, in their official capacities, are due to be dismissed. In addition, because there does not exist a constitutional deprivation by Officer Ward, the plaintiff's § 1983 claim against Officer Ward in his official capacity must fail. *See supra* at 549–550.

## IV. State Law Claims

 The court will next address whether it will exercise supplemental jurisdiction over the remaining state claims, which include assault and battery, wrongful death, the tort of outrage or infliction of emotional distress and negligent failure to train, supervise and/or discipline. The defendants contend that they are entitled to summary judgment on all the state law claims.

The Judicial Improvements Act of 1990, Pub.L. No. 101–650, 104 Stat. 5089, substantially altered the law concerning ancillary and pendent jurisdiction. The Act creates, as 28 U.S.C. § 1367, a new provision concerning "supplemental jurisdiction." This provision codifies and revises the law that had developed under the labels "pendent" and "ancillary" jurisdiction. Specifically, subsection (a) of § 1367 dictates that as long as a federal district court has original jurisdiction of a claim, the court

shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The court stresses that the Act makes supplemental jurisdiction mandatory unless

there is a specific statutory exception. One such exception provided in subsection (c) of § 1367 states:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) *the district court has dismissed all claims over which it has original jurisdiction,* or
>
> (4) in exceptional circumstances, where there are other compelling reasons for declining jurisdiction.

In accordance with the foregoing authority, since no claims remain from which the court had original jurisdiction, the court shall dismiss the remaining state claim without prejudice.[15]

### CONCLUSION

In accordance with the foregoing discussion and analysis, the court finds that defendants Town of Notasulga, Lee County, Henry Chapman and Steve Thompson, and Ronald Ward's motions for summary judgment relating to the federal claims are due to be granted. The court further finds that the remaining state law claims in this case are due to be dismissed without prejudice. A judgment in accordance with this memorandum opinion will be entered separately.

---

**15.** The court does not consider whether the statute of limitations has run on the plaintiff's state law claims as "subdivision (d) of § 1367 recognizes the serious statute of limitations problems a claim may face after it has been 'declined' in a federal action." 28 U.S.C. § 1367 (quoting Practice Commentary at p. 836). Specifically, subdivision (d) recognizes that "it may now be too late under the state statute of limitations to bring a state action on the claim." *Id.* Therefore, subdivision (d) provides "that the [plaintiff] shall have at least a 30–day period [to file] the state action after it is dismissed by the federal court." *Id.*