Alma M. OWENS, et al., Plaintiffs,

v.

CITY OF FORT LAUDERDALE, et al., Defendants.

No. 99–6033–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 20, 2001.

Bradley Winston, Winston & Clark, Plantation, FL, for plaintiffs.

Clark Jones Cochran, Jr., Billing Cochran Heath Lyles & Mauro, Fort Lauderdale, FL, for City of Fort Lauderdale.

Michael Ross Piper, Johnson, Anselmo Murdoch Burke & George, Fort Lauderdale, FL, for Sheriff of Broward County, Michael Sokolowski, and Gregory Brown.

Dieter Klaus Gunther, Alan E. Boileau, Adorno & Zeder, Fort Lauderdale, FL, for Thomas Mangifesta and Frank DelRio.

Ronald Alfred Fitzgerald, Conrad & Scherer, Fort Lauderdale, FL, for Wilson Quintero and North Broward Hospital District.

## ORDER GRANTING CITY OF FT. LAUDERDALE'S MOTION FOR SUMMARY JUDGMENT

JORDAN, District Judge.

Alma Owens, as the survivor of Byron Owens, and together with his other survivors, sues the City of Fort Lauderdale, the North Broward Hospital District, Officer Thomas Mangifesta, and Officer Frank DelRio for violations of the Fourth and Fourteenth Amendments to the United States Constitution. *See* 42 U.S.C. § 1983. The plaintiffs allege that Officers Mangifesta and DelRio are liable for their role in Byron's death in their individual capacities and that the City of Fort Lauderdale and the North Broward Hospital District are liable based on failure to train and negligence amounting to deliberate indifference. Jurisdiction exists pursuant to 28 U.S.C. § 1331.

The City moves for summary judgment, arguing Officer DelRio was not acting under color of state law, that the force used to restrain Byron was not excessive and that in any event, it did not have policies or customs which worked a deprivation of Byron's constitutional rights. For the reasons explained below, the City's motion for summary judgment [D.E. 116] is GRANTED. The plaintiffs' motion for a ruling on the City's motion [D.E. 352] is also GRANTED. Each of the other pending motions [D.E.s 156, 207, 234, 240, 241, 242, 243, 244, 245, 246, 247, 248, 270, 307, 313, 315, 327, 342, 343] are DENIED AS MOOT.

## I. RELEVANT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the plaintiffs, the non-moving parties, there is evidence on which a jury could reasonably find a verdict in their favor. *See Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505; *Hilburn*, 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

## II. RELEVANT FACTS

On September 22, 1997, Ms. Owens, Byron's mother, received a call at her work from Byron, who explained that he was calling to say goodbye to her. *See* Deposition of Alma Owens at 18–19 [D.E. 123] (Oct. 1, 1999). Ms. Owens explained that she viewed Byron's call as a cry for help, and she returned home, where Byron also lived, to try to talk to him and to make sure he was fine. *See id.* at 19–20. When Ms. Owens arrived at the home, Byron was talking to his father, Johnnie Owens. *See id.* at 20. Byron was upset over a paycheck that he should have received, and his father, Mr. Owens, left the house

to try to speak to Byron's employer and obtain the check. *See id.* at 21. After his father left, Byron remained upset, and was crying. *See id.* Byron grabbed a vacuum hose and headed out to the car in the garage when he slipped and fell. *See id.* at 22. At that point, Ms. Owens decided to call 911 to seek help because Byron was threatening to commit suicide. *See id.* at 22–23.

An ambulance, with an EMS squad, accompanied by Broward County Sheriff's Deputy Michael Sokolowski, responded to the call. Byron at first resisted his parents' and the officers' attempts to transport him to the hospital. *See id.* at 23–24. At some point, Ms. Owens told the officers and EMS workers to forget about the call, that she was sorry she had bothered them. *See id.* at 25. Ms. Owens was informed, however, that once emergency workers were present, they had a duty to ensure Byron's safety. Given Byron's behavior, they could not simply leave and were obligated to take him to the hospital. *See id.* Ms. Owens and her husband eventually persuaded Byron to go to Broward General Medical Center in the ambulance for a psychiatric evaluation. *See id.* at 25–26. The officers dispute Byron's voluntariness, and contend that his transport was the result of the commencement of an involuntary commitment proceeding under Florida's Baker Act, Fla.Stat. § 394.463.

Once they arrived at the hospital, Byron calmed down, and fell asleep. *See id.* at 26. While he was sleeping, Byron's father left the hospital. *See id.* at 27. After his father left, Byron awoke, and a nurse came in to obtain a urine sample from him. *See id.* Byron refused to provide a urine sample, rose from the gurney where he had been lying, and attempted to leave the hospital. *See id.* at 28. Ms. Owens attempted to prevent Byron from leaving by holding onto his waist, but his physical size—6'2″ in height and approximately 300 pounds—prevented her from doing so. *See id.* Byron said he wanted to go to be with his deceased grandmother. *See id.* at 29.

While Byron was attempting to leave, two off-duty City of Fort Lauderdale police officers, Frank DelRio and Thomas Mangifesta, acting as security detail for the Hospital, were notified that they were needed. *See* Deposition of Frank DelRio at 40 [D.E. 124] (Dec. 10, 1999); Deposition of Thomas Mangifesta at 26 [D.E. 125] (Dec. 10, 1999). When the officers responded, they were informed that they had been called because a "Baker Act," i.e., Byron, was trying to leave and needed to be restrained. *See* DelRio Deposition at 44; Mangifesta Deposition at 28. Officer Mangifesta, the first of the two at the scene, testified that when he was told that a Baker Act needed to be restrained, he asked whether the papers had been signed, referring to a physician's signature, and was told that they had. *See* Mangifesta Deposition at 28. Officer Del-Rio testified that he asked whether they were sure Byron had been Baker Acted, and was assured that he had, and needed to be restrained. *See* DelRio Deposition at 45.

Neither officer could remember exactly who was at the scene. Both remembered the presence of the Hospital's patient care assistant, Wilson Quintero, as well as Broward County Sheriff's deputies Michael Sokolowski and Gregory Brown, and several other Hospital employees. *See* DelRio Deposition at 48–49; Mangifesta Deposition at 29, 36–37.[1] Ms. Owens was still attempting to persuade Byron to stay and see a doctor when one of the deputies entered the room. *See id.* at 30. The

---

1. Ms. Owens testified that during the ensuing struggle, approximately seven officers or Hospital employees were attempting to restrain Byron. *See* Owens Deposition at 34.

deputy attempted to speak with Byron, but Byron told him to "save it." *Id.* at 31. After this exchange, more deputies arrived on the scene, and Ms. Owens released Byron (she had been holding onto his waist, trying to physically restrain him) and went to the waiting room to tell her sister that Byron was trying to leave. *See id.* at 33. By the time Ms. Owens returned to the room with her sister, Byron was on the floor. *See id.* Ms. Owens testified that she could not even see Byron because he was underneath the deputies, but assumed that he was struggling with the officers because she heard one of the officers say "Give it up, big man." *Id.* at 34.

Initially, the officers attempted to calm Byron by speaking with him, but Byron was clenching his fists, rocking back and forth, and making statements, such as "You do what you have to do," and "Come on, you want some of this?" *See* DelRio Deposition at 50; Mangifesta Deposition at 32. Officer Mangifesta testified that he was concerned that Byron was going to injure himself or others if he attempted to evade the officers. *See* Mangifesta Deposition at 32. After several minutes of the officers trying to verbally calm Byron down, or negotiate with him, Byron attempted to leave by running directly through the officers, and Officer DelRio sprayed him with pepper spray. *See* Del-Rio Deposition at 50; Mangifesta Deposition at 32–33. The pepper spray did not hit Byron, but distracted him sufficiently for the officers to attempt to restrain him. *See* DelRio Deposition at 51–52; Mangifesta Deposition at 33. The officers wrestled Byron to the ground and attempted to handcuff him. *See* DelRio Deposition at 53; Mangifesta Deposition at 36. At no time before he was wrestled to the ground did Byron attempt to hit or kick the officers. *See* DelRio Deposition at 53; Mangifesta Deposition at 34.

Once he was on the ground, the officers testified that Byron continued to resist them; he was kicking and thrashing, and he started trying to bite anyone who came close to his mouth. *See* DelRio Deposition at 56–57; Mangifesta Deposition at 45–46. Officer DelRio, who was holding Byron's shoulders, ended up on top of him. *See* DelRio Deposition at 54–55. Officer Mangifesta was at Byron's head. *See* Mangifesta Deposition at 36. Byron was face down in a corner, holding his hands underneath his chest. *See* DelRio Deposition at 55; Mangifesta Deposition at 36–37. Officer Mangifesta was attempting to pull Byron's hands out from under him so that he could be handcuffed. *See* DelRio Deposition at 56; Mangifesta Deposition at 39, 45. Officer DelRio, laying on top of Byron, was holding his head back by placing one arm underneath his chin and using the other arm to hold his forehead back. *See* DelRio Deposition at 57. Officer DelRio's hands were "up around [Byron's] chin . . . around the chin and all, and [he] had [Byron's] head" in an attempt to prevent Byron from biting either of the officers. *Id.* at 56. Officer DelRio switched the position of his arms back and forth because Byron continued to try to bite him. *See id.* at 58. Officer DelRio described the incident as follows:

> I would change my hold back and forth. What I was doing is was [sic] keeping his neck up and his head because that's the—like this, I was trying to keep his head up and then switch because he would try to—[ ] once he felt this hand underneath him, he tried to go for it, so I'd have to switch over real quick and go back. So my hands were back and forth all the time. At one time I even grabbed his forehead and had his head up, trying to do it, but that started to slip also.

*Id.* at 58. Officer DelRio conservatively estimated that this struggle continued for

ten to fifteen minutes. *See id.* Other than the testimony excerpted above, neither Officer DelRio nor anyone else testified as to exactly how long he may have held Byron's head back or how long he may have held Byron's neck.

Officer Mangifesta described Officer DelRio as holding Byron's head by "bringing his arm around so that the inside portion of his elbow [was] right in the area of Mr. Owens' chin." Mangifesta Deposition at 46. Officer Mangifesta did not characterize Officer DelRio's restraint of Byron as a chokehold. *See id.* at 40. While Officer DelRio was attempting to control Byron's head, Officer Mangifesta was kneeling over Byron's head, attempting to pull at least one of his arms out from underneath him. *See id.* at 46. Officer Mangifesta believed the struggle lasted approximately ten minutes, but offered no specific testimony as to how long any one of Officer DelRio's head restraints lasted. *See id.* at 48.

During the struggle, a nurse injected Byron with medication to sedate him. *See* DelRio Deposition at 61; Mangifesta Deposition at 48. Once Byron had been somewhat subdued, which both officers attributed to the sedatives, the officers were able to handcuff him, and he remained restrained, face down on the floor, until he was moved to the gurney. *See* DelRio Deposition at 65; Mangifesta Deposition at 50. Once Byron was placed on the gurney, the handcuffs were exchanged for leather hospital restraints, which were placed on his wrists and ankles. *See* DelRio Deposition at 61; Mangifesta Deposition at 51.

While Byron was on the gurney, Officer Mangifesta could hear him breathing heavily, and "huffing and puffing." Mangifesta Deposition at 51. Officer DelRio also testified that when he was first placed on the gurney, Byron was breathing heavily. *See* DelRio Deposition at 71–72. Officer Mangifesta testified that approximate-ly three to four minutes after Byron was placed on the gurney, several paramedics entered the room and noticed that Byron's breathing was labored. *See* Mangifesta Deposition at 52–53. Officer DelRio estimated that the time period between Byron finally being restrained and the paramedics noticing his labored breathing was closer to five or ten minutes. *See* DelRio Deposition at 72. Ms. Owens testified that when the officers placed Byron on the gurney, he appeared to be breathing, but he was staring straight ahead, and seemed not to recognize her. *See* Owens Deposition at 36. Ultimately, Byron suffered a cardiac arrest. *See id.* at 38. He was resuscitated, but never fully regained consciousness, and he died almost two years later, on August 1, 1999.

Ms. Owens testified that the day after the incident, September 23, 1997, while she was at the hospital, her cousin, Rosella Dent, came to visit her and Byron in the intensive care unit. *See* Owens Deposition at 40–41. Ms. Dent worked in the emergency room, although she was not on duty at the time of the incident. *See id.* at 41. Ms. Dent told Ms. Owens that she had heard about the incident, but had not been told that the patient was Byron. Ms. Owens testified that Ms. Dent told her that she had overheard someone named Frank—presumably Officer DelRio—boasting that he had restrained the patient by putting him in a choke hold. *See id.* at 42, 81–83. Ms. Dent later denied making such a statement to Ms. Owens, and expressed her anger that Ms. Owens had involved her in the lawsuit. *See id.* at 82–83. Officer DelRio denied ever making such a statement to Ms. Dent. *See* DelRio Deposition at 77. Officer DelRio admitted, however, that he discussed the incident with Ms. Dent, who had identified herself to him as a friend of the family. *See id.* at 78.

The Hospital and the Fort Lauderdale Police Department have an arrangement regarding off-duty FLPD officers working for the city. The Hospital employs off-duty police officers in order to maintain a constant police presence in the emergency room. The officers are employed in their capacity as police officers, rather than private security officers, and they wear their FLPD uniforms, including gun and badge, while on duty. *See* Deposition of Dennis Kalam at 21 [D.E. 134, Exh. D] (Jan. 24, 2000). The City has adopted an off-duty detail policy requiring, among other things, that all officers working such details govern themselves in accordance with the City's policies and procedures. *See* Details Off–Duty Employment [D.E. 144, Exh. B] (May 18, 2000). The officers who work at the Hospital do so under the supervision of FLPD Sergeant Jim Polan. *See id.* at 14–16; Deposition of Jim Polan at 19 [D.E. 131] (Sept. 21, 1999). According to Sergeant Polan, the FLPD officers who work at the Hospital are always acting in their capacity as FLPD officers, and they remain subject to all policies and procedures of the FLPD. *See* Polan Deposition at 9. Sergeant Polan instructed the officers in a written memorandum that they were to represent themselves at all times as police officers. *See* Memorandum from Sergeant J.D. Polan [D.E. 144, Exh. A] (May 15.1995). Sergeant Polan further explained his belief that the officers continued to act "under color of state law" while working at the Hospital. Polan Deposition at 9; DelRio Deposition at 40; Mangifesta Deposition at 15–16. In fact, both Officer DelRio and Officer Mangifesta were wearing their FLPD uniforms on September 22, 1997. *See* DelRio Deposition at 40; Mangifesta Deposition at 15.

The Fort Lauderdale Police Department has adopted policies regarding both the use of force and the use of deadly force, neither of which mention lateral vascular neck restraints, or choke holds. *See* Poli-cies & Procedures, § 119.1 Force—Use of—General & § 119.2 Deadly Force [D.E. 120. Exh. 2] (April 17, 2000). Officer Mangifesta testified that he never received training regarding the permissibility of using a lateral vascular neck restraint from the City. *See* Mangifesta Deposition at 41. Officer Mangifesta testified that he had some familiarity with neck and head restraints from his training as an officer. *See id.* at 41–43. Sergeant Polan testified that he had never received training from the City regarding lateral vascular neck restraints, and that the City does not have a policy regarding whether such restraints are permissible. *See* Polan Deposition at 22. Officer DelRio testified that he was neither prohibited nor encouraged by the City to use a lateral vascular neck restraint. *See* DelRio Deposition at 19, 21.

The plaintiffs have compiled a series of incidents involving allegations of choking by Fort Lauderdale police officers, two of which—the incidents involving Lazaro Perera and Josephine Muro—allegedly occurred at the Hospital. In May of 1995, Lazaro Perera lodged an excessive violence complaint against Officer DelRio. *See* Internal Affairs Complaint Report Form [D.E. 254, Exh. B] (June 27, 1995). Mr. Perera was a patient at the Hospital and Officer DelRio was working the security detail. *See id.* at 2. The Hospital had discharged Mr. Perera, who was having difficulty locating a ride, and according to witnesses at the scene, he was becoming increasingly agitated. *See id.* at 2–3. Mr. Perera alleged that Officer DelRio approached him from behind and choked him for three to four minutes, forcing him to plead for his life. *See id.* at 1. Officer DelRio contended that Mr. Perera's version of events was fabricated, and that while he and the other officers were forced to arrest Mr. Perera, he did not resist arrest and no force of any kind was used. *See id.* After Mr. Perera filed his com-

plaint, the internal affairs division of the Fort Lauderdale Police Department investigated. It concluded that Mr. Perera had fabricated his complaint. *See id.* at 10.

The second alleged incident at the Hospital occurred April 25, 1998, seven months after the incident with Byron. On April 25, 1998, Josephine Muro was at the Hospital due to her mother's hip injury, and was in the emergency room waiting area with her father. *See* Affidavit of Josephine Muro ¶ 2 [D.E. 170] (June 26, 2000). Ms. Muro's father—who is 76 years old—became upset with the nurses about the amount of time they had spent waiting to see a physician. *See id.* ¶¶ 3–4. While Ms. Muro's father was with her mother in an examining room, a Fort Lauderdale police officer told him that he would have to wait outside. *See id.* ¶ 5. According to Ms. Muro, when her father refused to leave, the officer placed him in a choke hold. *See id.* The only record of this incident is Ms. Muro's affidavit, and there is no evidence that she or her father complained either to the Hospital or to the Fort Lauderdale Police Department.

The remaining incidents submitted by the plaintiffs took place outside of the hospital.

On July 16, 1994, Revo Keel complained that an officer had choked him while attempting to break up a domestic disturbance. *See* Revo Keel, Complainant Control Form [D.E. 254, Exh. A] (July 16, 1994). Mr. Keel never followed up on the investigation, and he moved without leaving a forwarding address. *See id.* Thus, the case was closed, and the allegations never investigated, much less sustained. *See id.*

On October 30, 1996, Claudstine Harp filed a complaint alleging that a Fort Lauderdale police officer had—without provocation—choked her and then arrested her. *See* Claudstine Harp, Complainant Control Form [D.E. 254, Exh. C] (Oct.

30, 1996). Ms. Harp's complaint was investigated by the police department's division of internal affairs, and was found to be unsubstantiated. *See id.*

On December 6, 1996, a Fort Lauderdale police officer arrested Daniel Bechtold at a nightclub in Fort Lauderdale. *See* Daniel Bechtold, Complainant Control Form [D.E. 254, Exh. D] (Dec. 6, 1996). Although Mr. Bechtold did not complain that he was placed in a choke hold or choked in any manner, his girlfriend told the investigating internal affairs officer that the arresting officer "[s]omehow he had him like by the head or neck or something." *Id.*, Dawn Taylor Interview at 11. Mr. Bechtold's allegation of excessive force was found to be unsustained. *See id.*

On January 31, 1997, Larry Daughtry complained that the officer who arrested him tripped him, slammed him into his car, and choked him. *See* Larry Daughtry, Complainant Control Form [D.E. 254, Exh. E] (Jan. 31, 1997). Mr. Daughtry alleged that the arresting officer used his arm and held him around the neck, choking him. *See id.*, Daughtry Interview at 7–10. Mr. Daughtry did not complain of being choked while he was being booked at the Broward County Jail. *See id.* Following an investigation, the office of internal affairs found Mr. Daughtry's complaint to be unsustained. *See id.*

On August 6, 1997, Charles Page was involved in a traffic accident while he was riding his bicycle. *See* Charles Page, Complainant Control Form [D.E. 254, Exh. F] (Aug. 6, 1997). Mr. Page left the scene of the accident, allegedly to take his bicycle home so that it would not be stolen while he was transported to the hospital. *See id.* When he walked away from the scene, an officer ran after him, and allegedly choked him. *See id.* The office of internal affairs found Mr. Page's allegations to be unfounded. *See id.*

## III. Under Color of State Law

██ The City first argues that it cannot be liable for any actions taken by Officer DelRio because he was not acting in his capacity as a City of Fort Lauderdale police officer. Rather, the City contends, Officer DelRio was off-duty, and was acting as a paid employee for the Hospital. The City concludes that as a result, Officer DelRio was not acting under color of state law for purposes of the City's liability under § 1983. The plaintiffs, in response, point to the overwhelming deposition testimony that the City officers who worked the detail at the Hospital believed that they were acting in their capacity as City police officers. Moreover, the officers who participated in the off-duty program at the Hospital were supervised by Sergeant Jim Polan, a City of Fort Lauderdale police officer. Sergeant Polan instructed the officers in a written memorandum that they were to represent themselves at all times as police officers. The City has adopted an off-duty detail policy requiring, among other things, that all officers working such details govern themselves in accordance with the City's policies and procedures.

The Supreme Court explained that a public employee is acting under color of state law when acting in his official capacity or while exercising his responsibilities under state law. *See West v. Atkins,* 487 U.S. 42, 49–50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted). These facts, taken in the light most favorable to the plaintiffs, support an inference that Officers DelRio and Mangifesta were acting under color of state law and as agents of the City for the purposes of summary judgment. *See Griffin v. City of Opa–Locka,* 261 F.3d 1295, 1302–06 (11th Cir. 2001).

## IV. Excessive Force

The plaintiffs argue that Officers DelRio and Mangifesta used excessive force to restrain Byron during the scuffle at the hospital. The City argues that it is entitled to summary judgment because the force used to restrain Byron was, as a matter of law, not excessive. Although § 1983 does not contain an independent state of mind requirement, the Supreme Court has made it clear that a municipality must act "deliberately" in order for liability to be imposed. *See Board of County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."). Thus, the threshold inquiry is whether Byron suffered a violation of his constitutional rights. To be entitled to summary judgment on this issue, the City must show that the plaintiffs failed to produce evidence such that a reasonable jury could find that the amount of force used to restrain Byron was excessive and therefore in violation of Byron's Fourth Amendment rights. *See Priester v. City of Riviera Beach,* 208 F.3d 919, 924 (11th Cir.2000).

██ Excessive force claims resulting from arrests or other stops by the police are "most properly characterized as arising out of the Fourth Amendment." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Such claims are measured under a "reasonableness" standard, which requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 395–96, 109 S.Ct. 1865 (citations omitted). Application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396, 109 S.Ct. 1865 (citing *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

The relevant inquiry in such a case is whether the officer's conduct was objectively reasonable under all the circumstances, regardless of any intent on the officer's part. *See id.* at 397, 109 S.Ct. 1865 (citing *Scott v. United States,* 436 U.S. 128, 137–39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)). *See also Jackson v. Sauls,* 206 F.3d 1156, 1169–70 (11 th Cir.2000) (discussing the excessive force standards pronounced by the Supreme Court in *Graham*). Whether an officer's use of force in a given case was excessive cannot be determined by a bright-line rule, and "[t]he hazy border between permissible and forbidden force is marked by a multi-factored, case-by-case balancing test … [which] requires weighing of all the circumstances." *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997). The factors courts should weigh include the severity of the detainee's offense, whether the detainee poses an immediate risk to himself or to others, and whether the detainee is actively resisting his restraint. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (citing *Garner,* 471 U.S. at 8–9, 105 S.Ct. 1694 (examining the totality of the circumstances)). Courts may also consider factors such as the severity of the injury inflicted, the number of persons the police have to deal with at one time, the duration of the action, and the dangerousness of the person subject to the police action in making this objective assessment. *See Crosby v. Paulk,* 187 F.3d 1339, 1351 (11th Cir. 1999) (citing *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997)).

■ The reasonable force analysis does not change because of the existence or status of any involuntary commitment proceedings. *See Doby v. DeCrescenzo,* 171 F.3d 858, 871 (3d Cir.1999) (analyzing plaintiff's claims of excessive force during an involuntary commitment proceeding under the Fourth Amendment); *Dowdell v. Chapman,* 930 F.Supp. 533, 543 (M.D.Ala. 1996) (same) (citing *Glass v. Mayas,* 984

F.2d 55, 58 (2d Cir.1993); *Maag v. Wessler,* 960 F.2d 773, 775 (9th Cir.1991)). *Cf Wood v. City of Lakeland,* 203 F.3d 1288, 1293 (11th Cir.2000) (finding that officer who shot plaintiff during attempted seizure for involuntary commitment acted reasonably under all the circumstances and was entitled to qualified immunity on interlocutory appeal). Thus, the same factors the Supreme Court enumerated in *Graham* will be weighed and analyzed in determining whether Officers DelRio and Mangifesta acted reasonably in their seizure of Byron.

■ Under Florida's Baker Act, the officers could have instituted involuntarily commitment proceedings against Byron if (1) they had reason to believe he was mentally ill and as a result had refused voluntary examination or was unable to determine for himself whether the examination was necessary, and (2) they believed that there was a "substantial likelihood that without care or treatment" Byron would have suffered from neglect which posed a "real and present threat of substantial harm" to Byron's well-being, or that Byron would have caused "serious bodily harm to himself [ ] or others in the near future, as evidenced by [his] recent behavior." FLA.STAT. § 394.463(*l* ).

The City argues that Byron posed a danger to himself and others, and contends that because the force used was only to restrain and subdue him, it was not excessive. The plaintiffs respond that Byron was in fact not being involuntarily committed under the Baker Act. As a result, no justification for using force existed, and therefore any force used was excessive. The plaintiffs also note that, even assuming Byron was in custody as a Baker Act detainee, the force used to restrain him was excessive under the circumstances. The City replies that Byron's behavior during the incident necessitated the use of

force, which was reasonable under the circumstances. The City's argument that the force used was not excessive because the officers were justified in using *some* force, fails as a matter of law. *See, e.g., Graham,* 490 U.S. at 393–94, 109 S.Ct. 1865. The plaintiffs contend that Officer DelRio's restraint of Byron—by holding his head back, placing one arm around Byron's head, and the other around his neck, with the inside of the elbow under Byron's chin—was a choke hold. They further argue that this hold, which by the officers' own admissions may have lasted as long as ten or fifteen minutes, was unreasonable. The City argues that the officers' restraint of Byron's head was necessary because Byron was attempting to bite the officers. The plaintiffs have not contradicted the officers' testimony that the hold was the result of Byron's attempts at biting Officer Mangifesta, but they do contend that the hold was more in the nature of a choke hold than a restraint. Even without Ms. Owens' testimony regarding Ms. Dent's statement that she had overheard "Frank" boasting about a choke hold, which I do not consider because it presents a double hearsay problem, I find that a material issue of fact exists as to whether Officer DelRio actually placed Byron in a choke hold or merely attempted to restrain his head, given the description of the incident by the officers themselves.

The plaintiffs also contend that Officer DelRio's application of a choke hold on Byron was deadly force, which was unreasonable under the circumstances. The Eleventh Circuit has not held, however, that a choke hold is, as a matter of law, deadly force. *See Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559–60 (11th Cir.1993) (holding that the application of a choke hold, although unnecessary, was not, as a matter of law, unreasonable under the circumstances, and finding qualified immunity). *But cf. Gahn v. Fujino,* Nos. 93–35525, 93–35535, 1994 WL 587527, at *3 (9th Cir. Oct.21, 1994) ("A choke hold can cause serious bodily injury or even death.") (citing *Maddox v. City of Los Angeles,* 792 F.2d 1408, 1411 (9th Cir. 1986)). The Fort Lauderdale Police Department, as noted earlier, does not have a written policy regarding the use of choke holds. *See* Polan Deposition at 22. *See also Scott v. Henrich,* 39 F.3d 912, 915–16 (9th Cir.1994) (explaining that internal police policies may be useful in determining the amount of force that is objectively reasonable, and using as an example a police policy against choke holds).

I must weigh and balance the factors the Supreme Court highlighted in *Graham,* 490 U.S. at 396, 109 S.Ct. 1865, and consider the totality of the circumstances to determine whether the officers used excessive force in restraining Byron. Even assuming that a reasonable officer would have believed that Byron was subject to involuntary commitment under the Baker Act, he had committed no offense or crime. The officers could have reasonably believed, however, based on Byron's behavior, that he posed a threat to himself or to others. Additionally, whether involuntary commitment proceedings had begun or not, it is undisputed that Byron was at the hospital as a result of his suicidal and depressed demeanor. According to the testimony of those present, Byron tried to run through the deputies, actively resisted the officers' attempts to restrain him, and attempted to bite the officers. Thus, the officers could have reasonably believed that some amount of force was necessary to keep Byron in the hospital and prevent him from harming himself or others.

Viewing the totality of the circumstances, and taking the facts in the light most favorable to the plaintiffs, I find that material issues of fact exist as to whether the force used by the officers was excessive, and thus summary judgment is inap-

propriate on this issue. For instance, an issue of fact exists as to whether Officer DelRio actually used a choke hold on Byron or merely held his head back with a restraining maneuver. While this force may have been reasonable had Byron been in custody as the result of a lawful arrest, he was merely a mentally disturbed patient who may or may not have been subject to the Baker Act. The officers therefore may not have been acting reasonably. Furthermore, the record is unclear as to how long Officer DelRio applied the restraint to Byron, and it is fair to infer at this stage that the restraint was applied for more than just a couple of minutes. Accordingly, for summary judgment purposes, there is enough evidence to permit a trier of fact to conclude that Byron suffered a violation of his Fourth Amendment rights by being subjected to unreasonable force.

### V. MUNICIPAL LIABILITY

■ To impose liability on the City for failing to act to preserve a constitutional right under § 1983, the plaintiffs must establish: (1) that Byron's constitutional rights were violated; (2) that the City had a policy or custom that constituted a deliberate indifference to Byron's constitutional rights; and (3) that the violation was caused by the policy or custom. *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ It is well settled, and undisputed here, that municipalities and their agencies can be sued directly under § 1983. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, municipalities bear liability only if the unconstitutional action implements an official municipal policy or is pursuant to a governmental custom. *See id.* Municipalities are not subject to liability on *respondeat superior* theory, as only direct liability may be imposed. *See id.* at 691, 98 S.Ct. 2018.

■ The plaintiffs allege that the City's failure to train the officers resulted in the violation of Byron's constitutional rights. Inadequacy of training may serve as the basis of liability under § 1983 only where the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *See City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S.Ct. 1197. *See also Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489–90 (11th Cir.1997) (discussing the standards in a failure to train claim brought under § 1983). Deliberate indifference can be shown by "continued adherence to an approach that [policymakers] know or should know has failed to prevent tortious conduct" or by "the existence of a pattern of tortious conduct by inadequately trained employees." *Brown,* 520 U.S. at 407–08, 117 S.Ct. 1382. *Cf. Farmer v. Brennan,* 511 U.S. 825, 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

To impose municipal liability, the plaintiffs must show either that "the need for a particular type of training [is] obvious because [officials] face clear constitutional duties in recurrent situations," or that "the need for more or better training [is] obvious [because] a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed." *Young v. City of Au-*

*gusta,* 59 F.3d 1160, 1172 (11th Cir.1995) (citing *City of Canton,* 489 U.S. at 390 & n. 10, 109 S.Ct. 1197; *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1481 (11th Cir. 1991)). *Accord Brown,* 520 U.S. at 409–410, 117 S.Ct. 1382. Under either theory, the plaintiffs must show that the City knew of the need to train the officers in the use of neck restraints and made a deliberate choice not to do so. *See Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998) (citing *Brown,* 520 U.S. at 407–09, 117 S.Ct. 1382). Additionally, the plaintiffs must show that the training program itself is deficient, and not just that a particular officer was inadequately trained. *See City of Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program... Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

The plaintiffs contend that the City's failure to either prohibit the use of neck restraints by police officers or to train the officers in the safe application of a neck restraint rises to the level of deliberate indifference. The City contends that the plaintiffs have failed to demonstrate the existence of prior incidents sufficient to show that the City was on notice of the need for additional training, thus the alleged failure to train cannot be said to have been deliberately indifferent.

In support of their contentions, the plaintiffs rely on the affidavit of Ken Katsaris. The City has filed a notice of joinder in the Hospital's motion to strike the Katsaris affidavit. *See* Notice of Joinder [D.E. 159] (June 20, 2000). Because the affidavit is so intertwined with the plaintiffs' response to the summary judgment motion. I will address the motion to strike concurrently with the motion for summary judgment.

The City argues that the Katsaris affidavit is fatally deficient because it is wholly conclusory. An affidavit containing conclusory assertions will not create an issue of fact sufficient to defeat a motion for summary judgment. *See Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000); *Beard v. Annis,* 730 F.2d 741, 743 (11th Cir.1984). *See also Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.,* 922 F.2d 220, 224 (5th Cir.1991) ("We have recognized that there is a level of conclusoriness below which an affidavit must not sink if it is to provide the basis for a genuine issue of material fact."). The City is correct that the Katsaris affidavit contains many conclusory statements and legal conclusions. *See* Affidavit of Ken Katsaris ¶¶ 4, 5, 13, 14, 16, 17, 19 [D.E. 154, Exh. H] (June 5, 2000). For example, Mr. Katsaris' opinion that the City was deliberately indifferent is of very little moment to me; that determination is precisely within the scope of my duties. *See Gold,* 151 F.3d at 1352 n. 10 ("[A]n expert's conclusory testimony does not control this Court's legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice of that need."); *Tennant v. Florida,* 111 F.Supp.2d 1326, 1334–35 n. 10 (S.D.Fla.2000) (same); *Ideal World Marketing, Inc. v. Duracell, Inc.,* 15 F.Supp.2d 239, 244 n. 2 (E.D.N.Y.1998) (holding that a "proposed 'expert' report, which offers a legal conclusion based upon the undisputed facts before the Court, impinges upon the Court's role, would be inadmissible at trial, and is of no probative value" on a motion for summary judgment).

## A. Pattern of Constitutional Violations: Widespread Abuse

 Even allowing for Mr. Katsaris' non-conclusory opinions,[2] the plaintiffs have failed to show that the City was deliberately indifferent to Byron by way of a failure to train Officers DelRio and Mangifesta. The plaintiffs have not shown a " 'history of widespread prior abuse' " such that the City was on notice of the need for training on the use of choke holds. *See Gold*, 151 F.3d at 1351 (quoting *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990)). The plaintiffs have simply failed to present evidence that rises to the level of a municipal policy under the law of this circuit. For example, in *Gold* the plaintiff—who was proceeding on a false arrest claim against the City of Miami for his disorderly conduct arrest—submitted evidence that between 1986 and 1991 there were 8201 disorderly conduct arrests, 601 of which were dismissed and 700 of which were nol prossed. *See id.* The Eleventh Circuit held that this evidence was insufficient to show that the City had a policy of effecting false arrests for disorderly conduct. *See id.* The Eleventh Circuit also noted that the plaintiff had failed to present any evidence of prior incidents of constitutional injuries similar to his. *See id.*

The plaintiffs here have submitted allegations of six[3] previous choking incidents. Of those incidents, only two are arguably similar. For example, the incidents involving Mr. Keel, Ms. Harp, and Mr. Page did not include allegations of being placed in a choke hold. Likewise, although Mr. Bechtold's girlfriend stated that the officer was holding him by the head or neck, Mr. Bechtold himself made no such allegation. Only the allegations made by Mr. Perera and Mr. Daughtry both involved the police placing them in choke holds. As an initial matter, it is the rare instance that only a couple of previous incidents will be sufficient to place a municipality on notice of "widespread abuse" constituting deliberate indifference. *See Gold*, 151 F.3d at 1351–53 (reversing jury verdict in favor of § 1983 plaintiff who alleged that city had policy of inadequate training and supervision of officers in connection with arrests made under disorderly conduct statute—plaintiff did not present evidence of prior constitutional violations or false arrests involving statute, and evidence that 15% of disorderly conduct charges in five-year period were dismissed or nolle prossed was insufficient to impose municipal liability). *See also Church v. City of Huntsville*, 30 F.3d 1332, 1345–46 (11th Cir.1994) ("[T]he

2. For example, Mr. Katsaris' assertions regarding his own training with the Lateral Vascular Neck Restraint and his belief that improperly trained or untrained persons should not apply neck restraints are based on personal experience and are not conclusory. *See* Katsaris Affidavit ¶¶ 10–11. Similarly, Mr. Katsaris' testimony that neither the City nor the Hospital provided any training as to neck restraints, and that off-duty detail officers at the Hospital did not receive training on neck restraints from any other source, are not conclusory. *See id.* ¶¶ 12, 18. Mr. Katsaris' affidavit is, however, rife with legal conclusions regarding whether certain actions were deliberately indifferent, and conclusions regarding causation, which, as noted above, I disregard. *See id.* ¶¶ 4–7, 13–17, 19, 22, 23, 24.

3. The plaintiffs have provided some evidence of seven incidents involving allegations of choking. Ms. Muro's affidavit, however, is insufficient to establish a previous incident for the purposes of notice to the City of an ongoing constitutional violation. While I do not, at least for summary judgment purposes, doubt the veracity of Ms. Muro's testimony, she does not claim that she informed the City or the Hospital of the incident. Without some complaint to the City, the plaintiffs cannot demonstrate that the City should have known of an ongoing pattern of constitutional violations based on this single incident. Thus, I consider only the six other incidents relied on by the plaintiffs to demonstrate notice.

evidence did not establish that City employees had a pervasive practice of violating the plaintiffs' constitutional rights."); *Sims v. Greenville County*, No. 99–1732, 2000 WL 380122, at *3 (4th Cir. Apr.14, 2000) (finding that one prior incident, which was factually distinguishable, did not place the municipality on notice of an inadequacy of training); *Ott v. City of Mobile*, 169 F.Supp.2d 1301, 1310–12 (S.D.Ala.2001) (holding that evidence of four substantiated complaints in the five years preceding the incident was insufficient to establish a question of fact regarding municipal liability under either a custom or policy or failure to train theory); *Mindler v. Clayton County*, 831 F.Supp. 856, 862 (N.D.Ga.1993) (finding that three prior incidents over a six year period was insufficient as a matter of law to create a question of fact as to municipal policy, and collecting cases); *Gomez v. Metro Dade County*, 801 F.Supp. 674, 679–80 (S.D.Fla. 1992) ("This Court finds as a matter of law that the allegations [of four previous incidents] offered by Gomez as support for her theory that a *de facto* custom existed are nothing more than isolated incidents that clearly cannot be said to establish or create a 'custom' or 'widespread practice.' ").

█ Still, had either Mr. Perera's or Mr. Daughtry's complaints been substantiated, and a concomitant determination been made that their constitutional rights had been violated, such an incident could have formed the basis of liability *if* the plaintiffs had also shown an unconstitutional policy which caused Byron's death. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal

policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.") (footnotes omitted); *Allen v. Muskogee, Okla.,* 119 F.3d 837, 842 (10th Cir.1997) ("[E]vidence of a single violation of federal rights, *accompanied by* a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability.") (emphasis added) (citations omitted); *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991) (holding that a single decision may form the basis for liability " 'under appropriate circumstances' ") (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Unfortunately for the plaintiffs, the complaints lodged by both Mr. Perera and Mr. Daughtry (as well as those of the other complainants discussed above) was wholly unsubstantiated, rendering it of little value for purposes of establishing previous constitutional violations. *See Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir. 1987) (finding that 10 previous complaints, each of which were investigated and found to be meritless was insufficient evidence that officials should have been aware of past misconduct). *See also Ott,* 169 F.Supp.2d at 1310–12 (discussing the Eleventh Circuit's requirement that to impose municipal liability for a custom or policy based on widespread practice, the previous incidents must have been meritorious); *Roberts v. City of Geneva,* 114 F.Supp.2d 1199, 1211 (M.D.Ala.2000) (holding that two previous incidents, neither of which involved an unlawful violation of constitu-

tional rights, were insufficient to show a "widespread practice" on which municipal liability could be imposed).

To the extent that the plaintiffs contend that the City's failure to either prohibit the use of neck restraints by the off-duty police officers or to train the officers in the safe application of a neck restraint is unconstitutional in and of itself, and therefore actionable under *Tuttle*, this argument must fail. *See* 471 U.S. at 823–24, 105 S.Ct. 2427 (holding that a single incident will be actionable only where "proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy"). The plaintiffs have simply not shown that the City policy, or lack thereof, regarding the officers' training was unconstitutional. The plaintiffs' sole support for the proposition that the City's failure to provide additional training to police officers regarding neck restraint is per se unconstitutional is the Katsaris affidavit. As noted above, this affidavit is an insufficient authority on which to base their constitutional argument. In short, the failure of the City to provide specific training on neck restraints is not unconstitutional such that the single incident with Byron can be said to have been the result of a municipal policy. *See Guseman v. Martinez,* 1 F.Supp.2d 1240, 1261 (D.Kan.1998) (holding that in the absence of prior incidents, the plaintiff's death from positional asphyxiation, even if caused by the police officers, could not be attributed to a city policy, and noting that "[s]uch an eventuality would have seemed remote prior to this incident").

Given that the plaintiffs have presented only two similar previous incidents, and given that both incidents were unsubstantiated, the plaintiffs have failed to present the kind of pattern or series of violations which would place the City on notice that its training program was inadequate. *Cf. Daskalea v. District of Columbia,* 227 F.3d 433, 441 (D.C.Cir.2000) (holding that where evidence showed that a federal district court had previously found the defendant liable for same type of violations in present case, and the defendant failed to institute a training program following that decision, jury heard ample evidence on which to base a finding of deliberate indifference); *Young,* 59 F.3d at 1172–73 (holding that evidence that numerous inmates, in addition to the plaintiff, had complained about inadequate treatment for medical conditions, and that the alleged mistreatment lasted over the course of several months, was sufficient to permit a jury to infer that the City was deliberately indifferent, thus providing a basis for municipal liability); *Dowdell,* 930 F.Supp. at 545–46 (finding that municipal liability could not be predicated on a "single and isolated occurrence ... because such an unusual occurrence does not rise to the level of 'deliberate indifference' necessary to succeed on a claim for failure to adequately train police officers.") (citing *Tuttle,* 471 U.S. at 823–24, 105 S.Ct. 2427).

### B. CLEAR CONSTITUTIONAL DUTIES IN RECURRENT SITUATIONS: NO OBVIOUS NEED

The plaintiffs also contend that this case fits into the narrow range of circumstances in which the need to train was so obvious that the failure to do so can be said to have been deliberately indifferent. *See Brown,* 520 U.S. at 409–410, 117 S.Ct. 1382; *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197. The only hypothetical example the Supreme Court has given of a need to train that is "so obvious" without prior constitutional violations is the use of deadly force when officers are provided with firearms. *See Gold,* 151 F.3d at 1352 (citing *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197). The Eleventh Circuit found in *Gold* that the plaintiff's contentions that the city had failed to train officers regarding the

disorderly conduct statute and responding to handcuff complaints fell " 'far short of the kind of obvious need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city.' " *Id.* (quoting *City of Canton,* 489 U.S. at 396–97, 109 S.Ct. 1197).

. The plaintiffs contend that this case falls within the "narrow range of circumstances, [when] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Brown,* 520 U.S. at 409, 117 S.Ct. 1382 (citing *City of Canton,* 489 U.S. at 390 & n. 10, 109 S.Ct. 1197). The plaintiffs analogize the failure to train officers specifically in the use of neck restraints to the failure to train officers in the use of firearms. I do not think the analogy is apt. This is simply not the type of case in which Byron's injury was "a highly predictable consequence" of a failure to train regarding neck restraints. *Id. See also Gold,* 151 F.3d at 1352 (noting that the only example of a need to train that is "so obvious" even without notice of prior constitutional violations is the use of deadly force when the police carry firearms) (citing *Brown,* 520 U.S. at 409–10, 117 S.Ct. 1382); *Guseman,* 1 F.Supp.2d at 1261 (holding that the plaintiff's death from positional asphyxiation was not within the "narrow range of circumstances" such that the municipality would be liable in the absence of prior incidents).

Similarly, in *Palmquist v. Selvik,* 111 F.3d 1332, 1346–47 (7th Cir.1997), the Seventh Circuit held that a single incident, in which a mentally disturbed citizen was shot by police attempting to take him into custody, was insufficient to "make a lack of training so obvious, and any inadequacy therein so likely to result in the violation of constitutional rights," that the municipality could be said to have been deliberately indifferent. Such is the case here. The

plaintiffs simply can not show that the likelihood that officers will be forced to restrain citizens—and especially mental patients such as Byron—using choke holds, or lateral vascular neck restraints is so obvious, and constitutional violations so likely to result, that the failure of the City to train on the use of choke holds was deliberately indifferent.

## VI. CONCLUSION

In sum, I find that while a reasonable jury could find that Officers DelRio and Mangifesta may have acted with an unreasonable amount of force, there is no basis on which to hold the City liable. Accordingly, the City's motion for summary judgment [D.E. 116] is GRANTED. A final judgment shall issue by separate order.